826 A.2d 673

THE HOUSING AUTHORITY OF THE CITY OF NEW BRUNSWICK, ACTING AS REDEVELOPMENT AGENCY, PLAINTIFF–RE-SPONDENT AND CROSS–APPELLANT, v. SUYDAM INVES-TORS, L.L.C., DEFENDANT–APPELLANT AND CROSS–RE-SPONDENT, AND TINTON FALLS STATE BANK, THE CITY OF NEW BRUNSWICK, A MUNICIPAL CORPORATION, GTL INVESTMENTS, L.P., AMERICAN BANKERS LIFE ASSUR-ANCE COMPANY OF FLORIDA, JOHN DOES 1–10, PUBLIC SERVICE ELECTRIC & GAS COMPANY AND JOHN DOES, 11–20, DEFENDANTS.

Argued April 29, 2003—Decided July 10, 2003.

4

*James M. Turteltaub* argued the cause for appellant and cross-respondent (*Carlin & Ward*, attorneys; *Mr. Turteltaub and William J. Ward*, of counsel and on the briefs).

*Marvin J. Brauth* argued the cause for respondent and cross-appellant (*Wilentz, Goldman & Spitzer*, attorneys; *Mr. Brauth and Yvonne Marcuse*, of counsel and on the briefs).

*Maureen Hinchliffe Bonney*, Deputy Attorney General, argued the cause for amicus curiae State of New Jersey (*Peter C. Harvey*, Acting Attorney General of New Jersey, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel; *Ms. Bonney and Dale Laster Lessne*, Deputy Attorney General, on the briefs).

The opinion of the Court was delivered by

LONG, J.

Eminent domain is the awesome power of the sovereign to take property for public use without the owner's consent. 1 *Nichols on Eminent Domain* § 1.11, at 1–7 (Sackman ed.3d ed.2002). Although that power has been exercised in one form or another since Roman times, 1 *Nichols, supra,* § 1.12, at 1–14 (citing *Annals of Tacitus,* Bk. I, p. 75), the actual term "eminent domain" was not coined until 1625 when Hugo Grotius described the power this way:

> [T]he property of subjects is under the eminent domain of the state, so that the state or he who acts for it may use and even alienate and destroy such property, not only in the case of extreme necessity, in which even private persons have a right over the property of others, but for ends of public utility, to which ends those who founded civil society must be supposed to have intended that private ends should give way. But it is to be added that when this is done the state is bound to make good the loss to those who lose their property.

[*Id.* at 1–15 (citing Hugo Grotius, *De Jure Belli et Pacis* ).]

In general, eminent domain springs from two separate legal doctrines. The right of the State to take private property for the public good arises out of the necessity of government, whereas the obligation to make "just" compensation stands upon the natural rights of the individual guaranteed as a constitutional imperative. 1 *Nichols, supra,* § 1.11, at 1–10 (citing 1 *Thayer's Cases on Constitutional Law* 953); *U.S. Const.* amend. V; *N.J. Const.* art. 1, ¶ 20. There is an inherent tension between those notions in every condemnation case. Nowhere is that tension more obvious than at the point at which contaminated property is taken by condemnation.

In this appeal, we are called on to address several questions arising out of the intersection of eminent domain and environmental law. Primary among them is the extent to which evidence of environmental contamination is admissible at the valuation stage of a condemnation action to determine the fair market value of the property. A secondary issue is whether a condemnor is entitled to an order that requires a portion of the estimated value to be held on deposit until final resolution of the environmental claims against the condemnee. We hold that contaminated property that is the subject of condemnation is to be valued as if it has been remediated and that the condemnor may seek an order requiring a portion of the award to be set aside to satisfy the condemnee's clean-up and transfer obligations.

## I

Defendant Suydam Investors, LLC (Suydam) is the owner of three parcels of land located on George Street and Remsen Avenue in downtown New Brunswick. Plaintiff Housing Authority of the City of New Brunswick (Authority) sought to acquire Suydam's property for a redevelopment project as part of the "Lower George Street Redevelopment Area" in New Brunswick. The parcels at issue can be described as follows: Fifteen (15) Remsen Avenue is the site of a 2.5 story dwelling that houses two

residential apartments and a detached three-car garage. Two hundred forty-four to two hundred forty-six (244–246) George Street is the site of a one-story building that houses four commercial retail units. Two hundred fifty-two to two hundred fifty-four (252–254) George Street is the site of a three-story building that houses two commercial units and eight residential apartments. The Authority intends to construct approximately sixty-one residential rental units and associated commercial units on the property.

In March 1999, the Authority, through its developer, The Community Builders, Inc. (Developer), retained the firm of Adler Geoscience, Inc. (Adler) to provide environmental engineering services in connection with the redevelopment project. Adler inspected the property and subsequently prepared a Phase I environmental site assessment.[1] The Phase I report revealed that underground gasoline tanks had been maintained on the property; automobile body repair and services businesses that typically use hazardous substances had been conducted on the property; a spill of hazardous substances had occurred on an adjoining site; and the property housed structures that could contain asbestos and lead-based paint. The Phase I report recommended that "further investigation be conducted at the site." Apparently Adler sent the Phase I report to the Developer but not to the Authority.

In January 2000, without that report and before filing its condemnation action, the Authority offered Suydam $972,000 for the property based on an expert appraiser's valuation. In order to comply with its statutory requirement the Authority had invited Suydam to accompany the appraiser, Jerome T. Gall, during his inspection of the property but Suydam did not do so. Gall employed a sales comparison approach and a capitalized income approach in valuing the property. Gall concluded that the highest

---

[1] The Phase I investigation combines a walk through of the property with site history and evidence of prior uses, location and governmental permits or notices. Robert I. McMurray, *Treatment of Environmental Contamination in Eminent Domain Cases*, C975 *ALI–ABA* 237 (1995).

and best use of the properties would be to demolish the existing improvements and utilize the site as zoned for commercial and residential purposes. It was Gall's opinion that the land value exceeded the total value of the property in its existing use and that the present use of the property was an interim use. He stated that, in valuing the property, he did not consider "the existence of potentially hazardous material used in the construction or maintenance of the building, such as the presence of toxic waste, which may or may not be present on the property." Accordingly, the Authority informed Suydam that its offer was "contingent on the satisfactory environmental status of the property, as the appraisal does not take into account any environmental problems that could affect value."

Suydam made a counter offer of approximately $2,500,000. Suydam also requested the Authority to provide "any environmental studies which may have been performed by [the Authority] or any parties working in conjunction with or on behalf of [the Authority] with regard to the [subject] property[.]" In response, although the Authority for some reason indicated that it had "neither obtained nor authorized any other appraisals, opinions of value, or environmental studies of the subject property" except the appraisal performed by Jerome Gall, it provided Suydam with a copy of the Phase I report which by that time, it had obtained.

After several unsuccessful attempts to negotiate an agreement regarding the property's value, the Authority filed a verified complaint, an order to show cause, and a declaration of taking on March 22, 2000. The complaint did not allege that the property was contaminated but stated:

17.   Plaintiff's offer of $972,000 is based upon the assumption that the Property is not subject to any matters not of record, including any assessment, cleanup requirement, penalty or reversion of title that may be imposed pursuant to any environmental statute, regulation, ordinance or other applicable environmental law.

In conjunction with the declaration of taking, the Authority deposited $972,000 in court pursuant to *N.J.S.A.* 20:3–18. Suydam did not oppose the taking, and in May 2000, the trial court entered a final judgment (1) declaring that the Authority had the power to

condemn the subject property and (2) appointing three commissioners to determine its fair market value. In July 2000, the trial court granted Suydam's unopposed motion to withdraw the $972,000 that the Authority had deposited into court.

From October 2000 through March 2001, Adler conducted Phase II of its environmental assessment of Suydam's property. Because of "impermeable subsurface conditions (*i.e.*, fractured shale bedrock)," Adler was unable to conduct a complete assessment. Adler nevertheless tested those portions of the property that were accessible and amenable to soil sampling and submitted a summary report. The Phase II report indicated, among other things, the presence of asbestos, underground storage tanks, and lead-based paint and provided cost estimates for asbestos abatement and storage tank removal. It also recommended that the impermeable areas be fully investigated during construction but after demolition of the existing buildings on the property.

Thereafter, the Authority moved for leave to amend its complaint for the purposes of (1) alleging the presence of environmental contamination including asbestos and lead paint, as a factor affecting the value of the property, (2) reserving its right to recover environmental cleanup costs, and (3) staying the commissioners' hearing "for a period of no more than one year, pending final resolution of all environmental liability and cost issues[.]" The Authority's reservation of rights clause provided:

19. Plaintiff reserves any and all rights it has or may have to recover in this action, in any subsequent action, or by any administrative means, all costs of remediation and/or cleanup of the Property necessitated by conditions, if any, that were present at the time of taking. Plaintiff further reserves the right to seek, at its sole discretion, any and all remedies to compel defendants to remediate and/or clean up the Property in accordance with applicable laws and regulations.

In opposition to the motion, Suydam claimed that the Authority withheld "critical" information concerning the alleged environmental contamination on its property. Suydam further contended that the trial court's grant of the Authority's motion would result in an

unfair and prejudicial delay in the determination of just compensation for the taking.

The trial court granted the Authority's motion, stating:

The original complaint ... indicated that the offer of $972,000 is based upon certain assumptions including the property is not subject to any ... clean-up requirements.

Now [the Authority] wants to amend the complaint to ... say [,] notwithstanding what they said before, they believe that ... the property may be contaminated with asbestos and lead containing paints and that that would detract from the value of the property. So that issue goes to the valuation which is always an issue. And then they reserved the right to go after [Suydam] for clean-up costs on some other areas under the Spill Act[.]

. . . .

They certainly have the right to come after you under the Spill Act, whether they put it in [the complaint] or not. ... And the issue of what's on the property is a value issue which is the value before the commissioners to start with.

The trial court entered an order that granted the Authority leave to file an amended complaint, and a six-month stay to enable it to "attempt to complete its environmental investigations and commence any action that it deems necessary and appropriate to resolve all issues relating to environmental liability and for remediation costs associated with development of the subject property (the 'Environmental Issues')." The order further provided that "[i]f the Environmental Issues have not been fully and finally adjudicated after six (6) months, the commissioners shall determine the value of the subject property as if clean, and litigation as to the Environmental Issues shall be severed from the condemnation and continue as a separate action." In addition, the order provided that if the commissioners' award exceeded the $972,000 that Suydam had received as just compensation, the additional amount would be deposited into court "pending final resolution of the Environmental Issues."[2] Suydam appealed.

―――――――

[2] In November 2001, the Authority obtained a new appraisal of Suydam's property by Russell K. Sterling who valued it "as clean" at $1,358,000 (for reasons not at issue here) as of March 22, 2000, the date of the taking. Sterling concluded that the highest and best use of 244–246 George Street would be to demolish the existing structures and develop those parcels in accordance with

In a published opinion, *Housing Auth. of City of New Bruns-wick v. Suydam Invs.*, 355 *N.J.Super.* 530, 810 *A.*2d 1137 (2002), the Appellate Division held that (1) environmental contamination is relevant to a determination of the fair market value of a condemnee's property, *id.* at 537, 810 *A.*2d 1137; (2) a court may not order a portion of the condemnation award to be held on deposit to satisfy the condemnor's environmental claims because that would constitute an interdicted prejudgment attachment, *ibid.*; (3) the Authority did not breach its duty to engage in *bona fide* negotiations under *N.J.S.A.* 20:3–6 and *Rule* 4:73–1, *id.* at 543, 810 *A.*2d 1137; and (4) the doctrines of waiver and judicial estoppel did not preclude the Authority from asserting that environmental contamination adversely affected the fair market value of Suydam's property, *id.* at 544, 810 *A.*2d 1137.

We granted Suydam's petition for certification and the Authority's cross-petition, 175 *N.J.* 549, 816 *A.*2d 1050 (2003), and accorded *amicus* status to the State of New Jersey. We now affirm in

---

the existing zoning laws, which permit office, retail and multi-family residential uses. Sterling indicated that development of the highest and best uses would require the expenditure of approximately $300,000 for demolition costs, and would include abatement of environmental problems associated with the existing structure, plus an additional $10,000 to purchase an insurance policy providing coverage to the developer for future cleanup or liability associated with the contaminated area. Sterling also determined that the highest and best uses of 15 Remsen Avenue and 252–254 George Street were the current uses. He utilized a comparable sales method to value that property "as clean," then deducted Adler's estimated remediation costs, dollar-for-dollar, from that value to reach a "net" appraised value of Suydam's property. However, the adjustments in the Sterling appraisal apparently did not account for all of the environmental costs. For example, although the appraisal included deductions for required asbestos remediation and a leaking underground oil tank, there was no deduction for other required regulatory costs. Furthermore, although the appraisal indicated that the property would need a "No Further Action and Covenant Not to Sue" (NFA) letter from the New Jersey Department of Environmental Protection (NJDEP), as well as a deed notice, there were no deductions for the costs of obtaining an NFA letter, nor were there deductions for the necessary testing, engineering and environmental reports. Finally, the Sterling appraisal added a "10% factor for entrepreneurial profit" to compensate the owner for "overseeing the clean-up" on all environmental costs.

part and reverse in part.[3]

## II

Suydam urges this Court to delineate the parties' obligations regarding disclosure of environmental contamination under *N.J.S.A.* 20:3–6; to determine a uniform method for valuing condemned property that contains or may contain environmental contamination; and to provide guidance to the parties on when and how a condemnor should proceed to recover remediation costs associated with environmental contamination on property under applicable state and federal environmental laws.

More particularly, Suydam argues that the Appellate Division erred in affirming the trial court's order that permitted the Authority to amend its complaint one year after the institution of the condemnation action, even though the Authority knew or should have known that the property was contaminated at the time of the original filing. In that connection, Suydam claims that the Authority failed to fulfill its obligation to engage in *bona fide* negotiations, as required by *N.J.S.A.* 20:3–6 and therefore should be barred from asserting contamination as a value issue at the condemnation trial.

Further, Suydam challenges the trial court's approval of the Authority's reservation of rights provision in its amended complaint arguing that such a provision exposes it to "double liability" for the existence of contaminants on the property, *i.e.*, once as a reduction in calculating fair market value and again in a subsequent action for recovery of remediation costs.

In its cross-petition, the Authority urges us to reverse the Appellate Division decision to the extent that it held that "a condemnor ... is not entitled to an order that requires a portion of the condemnation award to be held on deposit to satisfy the condemnor's environmental claims," *Suydam, supra,* 355 *N.J.Su-*

---

[3] The trial on value has not taken place.

*per.* at 537, 810 *A.*2d 1137. In addition it seeks a determination whether *Inmar Assocs., Inc. v. Borough of Carlstadt,* 112 *N.J.* 593, 549 *A.*2d 38 (1988), prohibits a dollar-for-dollar deduction of environmental cleanup costs from the fair market value of condemned property. *Amicus* State of New Jersey essentially supports the Authority's argument regarding the retention of a portion of the condemnation award to satisfy environmental claims.

### III

### A.

The Authority in this case is vested with the power to acquire property by condemnation on behalf of the City of New Brunswick pursuant to *N.J.S.A.* 40A:12A–21, *N.J.S.A.* 40A:12A–8c and *N.J.S.A.* 20:3–39. In so doing, the Authority, like all other condemnors, is constrained by the provisions of the Eminent Domain Act, *N.J.S.A.* 20:3–1 to –50, and of the federal and State Constitutions that require that private property shall not be taken for public use without just compensation. *U.S. Const.* amend. V; *N.J. Const.* art. 1, ¶ 20. Just compensation means "the fair market value as of the date of the taking determined by what a willing buyer and a willing seller, neither being under any compulsion to act, would agree to." *County of Monmouth v. Hilton,* 334 *N.J.Super.* 582, 587, 760 *A.*2d 786 (App.Div.2000), *certif. denied,* 167 *N.J.* 633, 772 *A.*2d 935 (2001); *see State, by Comm'r of Transp. v. Caoili,* 135 *N.J.* 252, 260, 639 *A.*2d 275 (1994); *State v. Silver,* 92 *N.J.* 507, 513, 457 *A.*2d 463 (1983).

The Eminent Domain Act also provides the procedural framework that a condemnor must follow. Generally, "in the condemnation field, government has an overriding obligation to deal forthrightly and fairly with property owners. It may not conduct itself so as to achieve or preserve any kind of bargaining or litigational advantage over the property owner." *F.M.C. Stores Co. v. Borough of Morris Plains,* 100 *N.J.* 418, 426–27, 495 *A.*2d

1313 (1985) (citations omitted). Consistent with that view, the Legislature has mandated that a condemnor engage in *bona fide* negotiations with the owner of real property prior to filing a declaration of taking. *N.J.S.A.* 20:3-6 provides, in part:

> [N]o action to condemn shall be instituted unless the condemnor is unable to acquire such title or possession through bona fide negotiations with the prospective condemnee, which negotiations shall include an offer in writing by the condemnor to the prospective condemnee holding the title of record to the property being condemned, setting forth the property and interest therein to be acquired, the compensation offered to be paid and a reasonable disclosure of the manner in which the amount of such offered compensation has been calculated, and such other matters as may be required by the rules. Prior to such offer the taking agency shall appraise said property and the owner shall be given an opportunity to accompany the appraiser during inspection of the property.

The purpose of *N.J.S.A.* 20:3-6 is "to encourage public entities to acquire property without litigation ... thereby saving both the public and the condemnee the expense and delay of court action...." *County of Morris v. Weiner,* 222 *N.J.Super.* 560, 565, 537 *A.*2d 752 (App.Div.), *certif. denied,* 111 *N.J.* 573, 546 *A.*2d 501 (1988) (citing *Borough of Rockaway v. Donofrio,* 186 *N.J.Super.* 344, 353-54, 452 *A.*2d 694 (App.Div.1982)); *see City of Atlantic City v. Cynwyd Invs.,* 148 *N.J.* 55, 71, 689 *A.*2d 712 (1997) (commenting that purpose of statutorily-required negotiations is to encourage settlements and voluntary acquisition of property allowing condemnor and condemnee to avoid expense and delay of litigation).

*Rule* 4:73-1 sets forth the requirements for a condemnation complaint. The complaint must "include a statement showing the amount of compensation offered by the condemnor and a reasonable disclosure of the manner in which the amount has been calculated." *R.* 4:73-1. Unless a court "for good cause orders otherwise," reasonable disclosure includes a description of the property and a statement of its "full fair market value including a description of the appraisal valuation method or methods relied upon ...; and any unusual factors known to the condemnor which may affect value." *Ibid.*

The Eminent Domain Act also provides that

> [p]rior to the commencement of any action, a prospective condemnor ... may enter upon any property which it has authority to condemn for the purpose of making studies, surveys, tests, soundings, borings and appraisals, provided notice of the intended entry for such purpose is sent to the owner and the occupant of the property by certified mail at least 10 days prior thereto.
>
> [*N.J.S.A.* 20:3–16.]

According to the State, "[i]n response to a developing body of unreported case law," a governmental condemnor "routinely provides, as part of *bona fide* negotiations, an environmental assessment" of a condemnee's property and, if appropriate, testing data regarding the environmental condition of a condemnee's property. *See also State, by Comm'r of Transp. v. Town of Morristown,* 129 *N.J.* 279, 288, 609 *A.*2d 409 (1992) (remarking that absent court order, as part of pre-litigation *bona fide* negotiations condemnor is only required to disclose information related to manner of calculating offer made to condemnee).

The condemnor may file a "declaration of taking" contemporaneous with or after the institution of a condemnation action. *N.J.S.A.* 20:3–17. After that declaration is recorded and served on the condemnee and all occupants of the subject property, the condemnor is entitled to immediate and exclusive possession of and title to the property. *N.J.S.A.* 20:3–19. "Simultaneously with the filing of the declaration of taking, the condemnor shall deposit the amount of [the] estimated compensation with the clerk of the court." *N.J.S.A.* 20:3–18.

A condemnation action involves the issuance of two final judgments by the Superior Court: one declares that "the condemnor is duly vested with and has duly exercised its authority to acquire the property being condemned," *N.J.S.A.* 20:30–8, *N.J.S.A.* 20:3–2(j), and appoints "three commissioners to determine the compensation to be paid by reason of the exercise of such power." *N.J.S.A.* 20:3–12(b). The other deals exclusively with the valuation of the condemned property. *N.J.S.A.* 20:3–12(g)(h). Within four months of a trial court's appointment, the three commissioners, or at least a majority of them, must fix and determine the compensation to be paid by the condemnor to the condemnee.

*N.J.S.A.* 20:3–12(g). The commissioners' award becomes a final judgment if it is not objected to within sixty days of its filing. *N.J.S.A.* 20:3–12(g)–(h).

An appeal from the report of the commissioners may be taken by "[a]ny party who has appeared at the hearings of the commissioners, either personally or through an attorney," *N.J.S.A.* 20:3–13(a), "by filing a notice of appeal with the deputy clerk of the Superior Court in the county of venue within 20 days after the date of service upon him or her … of a copy of the report." *R.* 4:73–6(a). The appeal "shall be a trial de novo … without a jury, unless a jury be demanded." *N.J.S.A.* 20:3–13(b). Following the trial, the "amount of the judgment on the appeal," or the amount that has not been previously paid, "shall be paid to the parties entitled thereto or paid into court." *N.J.S.A.* 20:3–13(d).

### B.

Where property to be condemned is or may be environmentally unsound, other laws come into play as well. For example, several federal and State statutes impose liability on present and past owners of real property for the discharge of hazardous substances. *See* Comprehensive Environmental Response, Compensation, and Liability Act, 42 *U.S.C.A.* §§ 9601 to –9675 (CERCLA), New Jersey Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.50 (Spill Act), Industrial Site Recovery Act, *N.J.S.A.* 13:1K–6 to –14. Because the Spill Act is archetypical of many environmental statutes, its legislative scheme and purpose are instructive.

The Spill Act became law in 1976 "to deal with potential contamination from off-shore oil spills and to stem the 'threat to the economy and environment of this State' posed by the 'discharge of petroleum products and other hazardous substances.' " *Marsh v. New Jersey Dep't of Envtl. Prot.*, 152 *N.J.* 137, 144, 703 A.2d 927 (1997) (quoting *N.J.S.A.* 58:10–23.11a); *see also Pitney Bowes, Inc. v. Baker Indus., Inc.*, 277 *N.J.Super.* 484, 490, 649 A.2d 1325 (App.Div.1994) (stating that "overriding purpose of the Spill Act was to respond to the grave public consequences of

hazardous-substance discharges that threaten the health and safety of everyone").

The Spill Act imposes strict liability, "jointly and severally, without regard to fault," on "any person who has discharged, . . . or is in any way responsible" for the discharge of any hazardous substance. *N.J.S.A.* 58:10–23.11g–c(1); *See State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 *N.J.* 473, 502, 468 *A.*2d 150 (1983) (construing "in any way responsible" to include ownership or control over property at time of discharge). A discharge is defined under the Act as "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State." *N.J.S.A.* 58:10–23.11b.

The Act provides limited defenses to property owners. *N.J.S.A.* 58:10–23.11g–d. Liability, for example, will not attach if a discharge results from "[a]n act or omission caused solely by war, sabotage, or God, or a combination thereof." *N.J.S.A.* 58:10–23.11g–d. Additionally, a property owner who acquires contaminated property on or after September 14, 1993, is not liable for cleanup and removal costs if the owner demonstrates that the property was acquired after the discharge, that at the time of acquisition the owner did not know or have reason to know that a discharge occurred on the property, that the owner did not discharge the hazardous substance and is not responsible in any way for the substance, and that the owner gave notice of the discharge to the New Jersey Department of Environmental Protection on actual discovery of the discharge. *N.J.S.A.* 58:10–23.11g–d(2).

In 1991, the Legislature amended the Act to provide a cause of action to private plaintiffs to recover cleanup and removal costs for hazardous substances. *L.* 1991, *c.* 372, codified as *N.J.S.A.* 58:10–23.11f–a(3). *See Pitney Bowes, supra,* 277 *N.J.Super.* at 487–89, 649 *A.*2d 1325. Most important here, the Legislature again amended the Act in 1993 to provide governmental entities that

acquire property by eminent domain with qualified immunity from costs associated with the cleanup and removal of hazardous substances that began or occurred prior to the transfer of title. *N.J.S.A.* 58:10–23.11g–d(4). Further, the Spill Act was amended in 1997 as part of the Brownfields and Contaminated Site Remediation Act (the Brownfields Act), *L.* 1997, *c.* 278, codified at *N.J.S.A.* 58:10B–1 to –31. The committee statement accompanying the Brownfields Act provides in part:

> This bill was crafted with three predominant policy goals. First, the bill is intended to result in more remediations being performed and Brownfield's being redeveloped. Second, the bill will not lessen any environmental or health standard. The strict standards set in the 1993 legislation and enforced by the Department of Environmental Protection (DEP) will remain in place. Finally, the person responsible for the discharge will not be given any relief from liability. Only those "innocent" parties who either unknowingly buy contaminated property or who clean up a contaminated property that they have purchased will be given any liability protections.
>
> [Senate Budget and Appropriations Committee, *Statement to Senate Bill No. 39, Assem. No. 2250.*]

■ The Brownfields Act included an amendment to *N.J.S.A.* 58:10–23.11g–d(4) that broadened the immunity conferred on public entities that acquire real property to include property for redevelopment purposes:

> Any federal, State, or local governmental entity which acquires ownership of real property through . . . eminent domain, condemnation or any circumstance in which the governmental entity involuntarily acquires title by virtue of its function as sovereign, or where the governmental entity acquires the property by any means for the purpose of promoting the redevelopment of that property, shall not be liable, pursuant to subsection c. of this section or pursuant to common law, to the State or to any other person for any discharge which occurred or began prior to that ownership.
>
> [*N.J.S.A.* 58:10–23.11g–d(4).]

The only circumstance under which a governmental entity will not enjoy immunity under the Spill Act is the case in which that entity causes or contributes to the discharge of hazardous substances or "acquires ownership of real property by condemnation or eminent domain where the real property is being remediated in a timely manner at the time of the condemnation or eminent domain action." *N.J.S.A.* 58:10–23.11g–d(4).

It is the interplay between the Eminent Domain Act and the Spill Act that underpins our analysis.

## IV

We turn first to what we consider to be the pivotal issue in this case—valuation. The Appellate Division concluded that environmental contamination is an appropriate consideration in determining the fair market value of property. We have described "fair market value" as the "value that would be assigned to the acquired property by knowledgeable parties freely negotiating for its sale under normal market conditions based on all surrounding circumstances at the time of the taking." *Caoili, supra,* 135 *N.J.* at 260, 639 *A.*2d 275 (quoting *Silver, supra,* 92 *N.J.* at 514, 457 *A.*2d 463). "[T]he inquiry is not limited to the actual use of the property on the date of taking but is, rather, based on its highest and best use." *Hilton, supra,* 334 *N.J.Super.* at 587, 760 *A.*2d 786 (citations omitted). Highest and best use is defined as "'the use that at the time of the appraisal is the most profitable, likely use' or alternatively, 'the available use and program of future utilization that produces the highest present land value' provided that 'use has as a prerequisite a probability of achievement.'" *Ibid.* (quoting *Ford Motor Co. v. Township of Edison,* 127 *N.J.* 290, 300–01, 604 *A.*2d 580 (1992)). To constitute the "highest and best use," a use must be "1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive." *Hilton, supra,* 334 *N.J.Super.* at 588, 760 *A.*2d 786 (citations omitted).

The Authority argues that no true assessment of fair market value can take place unless it takes contamination into account. Suydam counters that devaluing its property for contamination when it is still subject to the costs of a remediation action constitutes an unfair double taking. Those arguments essentially reflect the split of authority in the country over whether evidence of contamination should be a consideration in assessing the fair market value of property in a condemnation proceeding.

Jurisdictions across the United States are sharply divided on the subject. Paul W. Moomaw, Notes & Comments, *Fire Sale! The Admissibility of Evidence of Environmental Contamination to Determine Just Compensation in Washington Eminent Domain Proceedings*, 76 *Wash. L.Rev.* 1221 (collecting cases). At the heart of the decisions that admit such evidence is the notion that environmental contamination is a property characteristic that necessarily affects value. *See, e.g., Redevelopment Agency of City of Pomona v. Thrifty Oil Co.*, 4 *Cal.App.*4th 469, 5 *Cal.Rptr.*2d 687, 689 n. 9 (1992); *Northeast Ct. Econ. Alliance, Inc. v. ATC P'ship*, 256 *Conn.* 813, 776 *A.*2d 1068, 1080 (2001); *Finkelstein v. Dep't of Transp.*, 656 *So.*2d 921, 922 (Fla.1995); *City of Olathe v. Stott*, 253 *Kan.* 687, 861 *P.*2d 1287, 1290 (1993); *State v. Brandon*, 898 *S.W.*2d 224, 227 (Tenn.Ct.App.1995). The cases that exclude the evidence view the issue as more complicated than merely denominating contamination as a characteristic of land. They cite, as the basis for the exclusion, the problem of potential double liability, the involuntary nature of condemnation and due process concerns. *See, e.g., Aladdin v. Black Hawk*, 562 *N.W.*2d 608, 614–17 (Iowa 1997); *Silver Creek Drain Dist. v. Extrusions Div., Inc.*, 245 *Mich.App.* 556, 630 *N.W.*2d 347, 351–56 (2001), *appeal granted*, 466 *Mich.* 860, 644 *N.W.*2d 761 (2002).

In different decisions, our Appellate Division has sanctioned both approaches for valuing contaminated property in condemnation. In *New Jersey Transit Corp. v. Cat in the Hat*, 353 *N.J.Super.* 364, 376–78, 803 *A.*2d 114 (2002), *aff'd*, 177 *N.J.* 29, 826 *A.*2d 690, 2003 *WL* 21543540 (2003), the Appellate Division approved the following procedure: the condemnor appraises the property as if remediated [4]; deposits that amount in a trust fund

---

[4] "As if remediated" is slightly different than "as if clean" insofar as it incorporates a so-called remediation stigma discount. *Inmar Assocs., supra,* 112 *N.J.* at 608–09, 549 *A.*2d 38. One commentator has described the notion of stigma by way of example: a house with an intact roof would be slightly more valuable to a buyer than a house with a roof that has been properly repaired because of the fear of further leaks and possible hidden damage in the house.

in court and reserves the right to bring a separate action to recover remediation costs. The second method was approved in this case: the condemnor considers environmental contamination in calculating the fair market value of the property, reduces the property value accordingly, deposits that money in court and reserves the right to file a separate action to recover any remediation costs. *Housing Auth., supra,* 355 *N.J.Super.* at 540, 810 *A.*2d 1137. It falls to us to choose the best of those methods.

There is no undeniably correct answer here. Certainly, there is some logic in concluding that contamination is a relevant factor in assessing fair market value. As the Appellate Division observed:

> We have previously held that environmental conditions are one of the circumstances that my affect a property's fair market value. In *State, by Comm'r of Transp. v. Shein,* 283 *N.J.Super.* 588, 596–97, 662 *A.*2d 1020 (App.Div.1995), *certif. denied,* 143 *N.J.* 325, 670 *A.*2d 1066 (1996), we recognized that the presence of wetlands would be considered by a knowledgeable party in negotiating a sales price for a property and therefore is a relevant factor in determining fair market value. We also held that even if the existence of wetlands is unknown on the date of taking, it still must be considered in determining the value of a property in a condemnation proceeding. *Id.* at 597–600, 662 *A.*2d 1020.
>
> We see no reason to treat environmental contamination that may affect the development potential of property, and hence its value, any differently than wetlands, steep slopes or any other physical condition on the property. Environmental contamination may adversely affect a property's value by imposing limitations on its use or requiring the expenditure of substantial money to remediate the condition.
>
> [*Id.* at 547–48, 810 *A.*2d 1137.]

On the contrary, to the extent that contamination, unlike wetlands and steep slopes, is subject to cure, it can fairly be argued that it is not an immutable condition of land and that its remediation is more like a transactional cost than a value concept. Because each view has merit, other considerations must come into play in determining how to treat contamination in condemnation.

Robert N. Sechen, *Relevance and Admissibility of Evidence of Environmental Contamination in an Eminent Domain Valuation Trial,* 25 *Stetson L.Rev.* 823, 831–32 (1996).

To us, the major issue is the reality of a condemnee's liability under the Spill Act and like statutory initiatives. When property is devalued for contamination in condemnation, landowners first receive discounted compensation in the condemnation proceeding and then are subject to the full cleanup costs, thus suffering what is colloquially denominated as a "double-take." Jeffrey Dworin, Comment, *Doing a Double Take: Environmental Damage Suits and Eminent Domain,* 1996 *Det. C.L.Rev.* 687, 689–92 (1996). Under that scheme, the condemnor receives a windfall by ultimately obtaining the property in a remediated state at the condemnee's cost, yet paying a discounted price due to the contamination. Moomaw, *supra,* 76 *Wash. L.Rev.* at 1252. We think that is fundamentally unfair.

It seems to us that valuing property as if remediated assures just compensation insofar as it relates to the notion of "highest and best use." If property is valued as is, its contaminated state will necessarily circumscribe its uses, concomitantly diminishing its fair market value despite the reality that it will likely be subject to cleanup.

We likewise view the treatment of disparate issues in appropriate forums as an important weight in the balance. Valuation is a relatively straightforward notion with which condemnation commissioners are familiar and experienced. Omitting the complications of contamination from the valuation process thus advances the speed and efficiency that are the hallmark of eminent domain proceedings. *See* 4 *Nichols, supra,* § 13.10, at 13–96 (commenting that admission of contamination in condemnation proceeding would spawn more litigation and cause additional delay and expense, which serves neither judicial economy nor finality). Indeed, the difficulty of estimating the value of contaminated property has been noted by other courts and commentators that have recognized that finding a comparable parcel on which to base an estimate of value is problematic because all contamination is different. *See Silver Creek Drain Dist., supra,* 630 *N.W.2d* at 354 (commenting that "contaminated properties are like snowflakes;

no two are alike."); The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice*, Advisory Opinion A0–9 (1997 ed.) (noting that use of comparables in analysis of specific situation is highly limited because each environmental problem is as unique as a fingerprint).

On the contrary, dealing with environmental issues in the cost-recovery proceeding makes sense. Such a proceeding allows for third-party claims against insurers, title companies, and prior owners, none of whom have a place at the condemnation table. More importantly, the cost-recovery proceeding makes available to the condemnee Spill Act defenses (for example, war, sabotage, Act of God, or a combination thereof, and non-responsibility in-fact) that are not relevant to an Eminent Domain proceeding. Admission of environmental issues into a condemnation trial circumvents those statutory defenses as well as the possible joinder of third parties. That distinction is the basis for the due process considerations cited in the out of state cases that exclude contamination as a value issue in condemnation.

All of those reasons underscore the propriety of reserving the contamination issue for the cost-recovery action. *See* Moomaw, *supra,* 76 *Wash. L.Rev.* at 1252 (concluding evidence of contamination should not be admissible to determine just compensation in eminent domain proceeding). We therefore approve that methodology. Henceforth, where property is contaminated, the condemnor should appraise as if remediated and deposit that amount into a trust-escrow account in court. In addition, the condemnor should reserve its right to initiate a separate action to recover remediation costs. Indeed, according to the *amicus,* prior to this case, it was "standard practice" for a governmental condemnor to follow that methodology.

Accordingly, we reverse the Appellate Division's determination that contamination should be considered as a valuation issue in a condemnation proceeding and remand the case for the application of the valuation methodology to which we have adverted.

## V

That is not the end of the inquiry. The Appellate Division also decided that the condemnor is not entitled to an order withholding a portion of the estimated award until final remediation costs are determined because that would effectively constitute a form of pre-judgment attachment of the condemnee's property, contrary to the attachment statute, *N.J.S.A.* 2A:26–1 to –16. Again, we disagree. In fairness to the Appellate Division, that decision made sense in light of the court's preliminary ruling allowing evidence of contamination as a value issue in condemnation. However, because we hold that the condemnation valuation scheme excludes evidence of contamination, and that the property should be valued as if remediated, placing a limit on what the condemnee may withdraw does not constitute pre-judgment attachment.

Indeed, scholars denominate that well-established methodology as the "trust-escrow" approach, which has received "widespread recognition." 7A *Nichols, supra,* § 13B.03(4), at 13B–68 (Patrick J. Rohan & Melvin A. Reskin eds.3d ed.2002):

> Under the trust/escrow approach, evidence of contamination is excluded from the eminent domain valuation trial, which is directed toward determining the full value of the property if it were uncontaminated. Once value is determined, the full award of just compensation is not paid directly to the owner. Rather, under this approach a portion of the award sufficient to cover cleanup costs is escrowed or held in trust until the exact amount of cleanup costs has been determined. Once response costs are determined, a corresponding amount representing the owner's liability is then disbursed from the trust or escrow account. Only the surplus, if any, is paid to the owner.
>
> [*Ibid.* (footnote omitted).]

The underpinning of that procedure is the differential between the estimated value of the property as contaminated and the value as if remediated. The estimated value of the former is obviously less than the latter. Because the enhanced value is to be generated by the incurring of a transactional cost (the cost to transfer and develop the property), that cost, in turn, is folded into the estimate. Thus, unlike the run-of-the-mill condemnation case that does not involve remediation and in which money is viewed as a

pure substitute for the res (the property), the estimated value in a contamination case has a component that is altogether outside the property itself—the transactional cost that will be incurred to give the condemnee the benefit of the as if remediated value. In light of the fact that attachment is the taking or encumbering of another's property, *see Black's Law Dictionary* 126 (6th ed.1990) (defining attachment as "[t]he act or process of taking, apprehending, or seizing . . . property"), withholding only the estimated transactional costs, which, in reality, do not belong to the condemnee, is not an attachment at all. Accordingly, there is no unfairness to the condemnee in the set-aside.

What would be unfair would be to value the property as if remediated and allow the condemnee to withdraw that enhanced amount without a withholding to secure the transactional costs. In those circumstances the condemnee could disappear or dissolve leaving the condemnor without a cleanup remedy. *See* McMurray, *supra,* C975 *ALI–ABA* 237 (remarking that if condemnee takes "the money and runs" condemnor will be left "holding the bag.").

The Appellate Division's concern over a condemnor asserting "frivolous or exaggerated" environmental costs to tie up the condemnee's award and to "gain unfair leverage" requires comment. Under the trust-escrow approach, when the condemnee makes a motion pursuant to *R.* 4:73–9(c) to withdraw the money paid into court the condemnee, in many instances, will agree with the proffered amount of the transactional costs, thus forestalling any further controversy. When there is a dispute over the amount however, a trial-type hearing will be held under *R.* 4:73–9(b) at which the condemnor will bear the burden of supporting the estimate of the transactional costs. If that burden is sustained, the withholding will be allowed and if not, the full amount will be released. The existence of such a proceeding to challenge withdrawal and the burden cast on the condemnor underscores the need for the condemnor to have performed at least a preliminary environmental assessment and to have evidence in hand on the contamination issue. That procedure should obviate the concern

of the Appellate Division over frivolous or exaggerated cleanup costs.

We see no unfairness to the condemnee in such a procedure. On the contrary, to us, excluding evidence of contamination at the valuation stage, valuing the property as if remediated and imposing the trust-escrow approach most fairly treats both the condemnor and the condemnee.

## VI

Although the question may be academic in light of our ruling regarding a remand for application of the valuation procedure we have approved, along with the likelihood of at least some new negotiations, we turn briefly to Suydam's argument that the Authority failed to engage in *bona fide* negotiations at the inception of this case. Suydam contends that the Authority played "fast and loose" with its obligations because it always knew the property was contaminated yet withheld that information in negotiations and failed to plead contamination in the original complaint. We are satisfied, as was the Appellate Division, that there is no factual basis for finding that the Authority's conduct in this case violated its obligation to engage in good faith negotiations. The Appellate Division stated:

> Although the Authority's original complaint did not allege that there was contamination on Suydam's property, the possible presence of contamination was disclosed during pre-complaint negotiations. While those negotiations were ongoing, the Authority sent Suydam excerpts from the "Phase I" environmental assessment performed by the redeveloper's environmental consultant, which identified possible areas of contamination and asked Suydam to contact the Authority regarding the access to the property required to conduct a "Phase II" environmental assessment. These excerpts indicated that underground gasoline tanks had been maintained on the property; automobile body repair and services businesses, which would typically use hazardous substances, had been conducted on the property; a spill of hazardous substance had occurred on an adjoining property, which could have migrated onto the property; and Suydam's property contained structures which could contain lead paint. Consequently, there is no basis for finding that the Authority possessed information concerning environmental contamination which it failed to disclose to Suydam during pretrial negotiations. Moreover, as the occupant of the property, Suydam had to have been aware of visible conditions that indicated the possible presence of contamination.

[*Housing Auth.*, *supra*, 355 *N.J.Super.* at 544, 810 *A.*2d 1137.]

We fully subscribe to those conclusions as well as the Appellate Division's consequent determination that the facts do not warrant application of principles of waiver or judicial estoppel, *id.* at 544–45, 810 *A.*2d 1137, and affirm them as fully supported by the record.

## VII

Our ruling makes it unnecessary for us to address Suydam's argument that the reservation of rights clause results in double liability or the Authority's contention that *Inmar Assocs.*, does not bar a dollar for dollar reduction from fair market value for environmental costs. Those issues are moot in light of our holding that contamination is not a value issue in condemnation.

## VIII

The judgment of the Appellate Division is reversed insofar as it declared that evidence of contamination is admissible in valuing condemned property and interdicted the trust-escrow approach. In cases like this, the condemnor should value property to be condemned as if remediated and reserve the right to maintain a separate cost recovery action. The value should be deposited in court in a trust-escrow account and released subject to the procedures we have outlined. The remaining issues, having been rendered moot, do not require a ruling. The matter is remanded to the trial court for application of the valuation methodology we have established.

*For reversal and remandment*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—6.

*Opposed*—None