47 A.3d 48

BOROUGH OF PAULSBORO, PLAINTIFF–APPELLANT, v. ESSEX CHEMICAL CORPORATION, DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued May 29, 2012—Decided July 16, 2012.

Before Judges GRALL, ALVAREZ and SKILLMAN.

*M. James Maley, Jr.,* argued the cause for appellant (*Maley & Associates,* attorneys; *Mr. Maley, Erin E. Simone* and *Emily K. Givens,* on the briefs).

*Kenneth H. Mack* argued the cause for respondent (*Fox Rothschild,* attorneys; *Mr. Mack,* of counsel and on the brief; *Barry J. Muller,* on the brief).

The opinion of the court was delivered by

SKILLMAN, J.A.D. (retired and temporarily assigned on recall).

In *Housing Authority of the City of New Brunswick v. Suydam Investors, L.L.C.,* 177 *N.J.* 2, 23–24, 826 *A.*2d 673 (2003), the Court held that contaminated property acquired in an eminent domain action must be valued as if the contamination had been remediated

and that the portion of the condemnation award required to pay the costs of remediation should be deposited into a trust-escrow account. The question presented by this appeal is whether this special methodology for valuing contaminated property applies in an eminent domain action for acquisition of property containing a landfill that has been closed with the approval of the Department of Environmental Protection (DEP). We conclude that the *Suydam* valuation methodology does not apply in such a case because the condemnee, having already obtained approval of its plan for closure of the landfill, is not subject to any additional liability for remediation of the site and thus will receive the full fair market value of its property as determined by ordinary valuation methodologies.

## I.

The condemnor involved in this appeal is the Borough of Paulsboro in Gloucester County. The condemnee is Essex Chemical Company. The property is a sixty-seven-acre riverfront tract, with frontage on the Delaware River and Mantua Creek, which includes a closed seventeen-acre landfill. The closure of the landfill, which consists of a forty-foot high mound of gypsum, was approved by the DEP.

In 2002, Essex entered into a forty-year lease of the part of the property where the landfill is located with BP Products North America, Inc. (BP), which has constructed a solar energy facility on that site. Under the terms of the lease, BP assumed responsibility for performing the monitoring and maintenance activities required under the DEP's approval of Essex's plan for closure of the landfill.

The condemnation of the property was the subject of a prior appeal by Essex from the judgment for possession and appointment of condemnation commissioners.[1] *Borough of Paulsboro v.*

---

[1] As noted in *Suydam*, 177 *N.J.* at 16–17, 826 A.2d 673, such a judgment and a judgment establishing the valuation of property acquired by eminent domain are each treated as final judgments that are appealable as of right.

*Essex Chem. Corp.*, No. A–6577–05, 2007 *WL* 2012606 (App.Div. July 13, 2007). In that appeal, we rejected Essex's argument that Paulsboro had not engaged in bona fide negotiations before filing its complaint, because the appraisal upon which Paulsboro based its offer did not value the property "as if remediated," as required by *Suydam* (slip op. at 3). In rejecting this argument, we stated:

... Essex fears that Paulsboro will seek to have the landfill removed and the land flattened as "remediation" at Essex's cost out of the condemnation proceeds deposited in court. We do not read the reservation of rights in the complaint as permitting Paulsboro to recover from Essex any costs incurred for removal of the landfill in order to permit a different use of the area it now occupies. The appraisal is based on the assumption that the landfill portion of the property lacks meaningful utility. ... We question whether any attempted action by Paulsboro to deconstruct an encapsulated landfill, closed and approved by the DEP ... which is in its closure and monitoring stage, would fall within the remediation costs contemplated by *Suydam* and [*N.J. Transit Corp. v. Cat in the Hat, L.L.C.*, 177 *N.J.* 29, 826 *A.*2d 690 (2003).*] In essence, this closed landfill has the right to exist on the property.

[slip op. at 10–11.]

We also observed that Paulsboro's appraisal of the subject property, which was then $1,215,000, "provided the basis for a bona fide fair market value offer for the property as if remediated, including the landfill." (slip op. at 15).

Following our affirmance of the judgment for possession, Paulsboro filed a declaration of taking and deposited its $1,215,000 estimate of fair market value into court. Essex filed a motion to withdraw the deposit, and Paulsboro responded by a motion to escrow those funds for future use in "remediating" the landfill. Relying partly on the previously quoted statement in our prior opinion that the cost of leveling the closed landfill would not appear to fall within the concept of the remediation costs contemplated by *Suydam*, the trial court denied Paulsboro's motion and granted Essex's motion allowing it to withdraw the deposit.

The condemnation commissioners appointed pursuant to the judgment determined that the property had a fair market value of $1,268,122. Essex appealed this award to the Law Division.

Before the valuation trial, Paulsboro's expert filed a new appraisal report, which valued the property at $1,249,000, based on a

valuation date of May 4, 2006, which was the date its complaint had been filed, rather than the earlier valuation date he had used in his original appraisal. In addition, the DEP issued a letter of interpretation before trial, which determined that the property had negligible wetlands rather than the eight acres both parties' experts had assumed in their original appraisals. After receiving this information, Paulsboro's expert again increased his appraisal of the property, this time to $1,337,500.

Based partly on the DEP's determination that the property contained negligible wetlands, Essex's expert also issued a revised appraisal report before trial, which valued the property at $2,200,000.

At a bench trial, the experts' appraisal reports were introduced into evidence, and both experts testified. With one exception, the experts relied upon the same comparable sales in valuing the subject property. However, they made different adjustments of those sales prices in their determinations of fair market value. Moreover, they used different valuation methods. In addition, Paulsboro's expert did not attribute any additional value to the four buildings on the property, while Essex's expert assigned a value of $190,000 to those buildings.

Based on this evidence, the trial court determined that the property had a fair market value of $1,518,750. In reaching this conclusion, the court determined that a per acre value of $22,500 was appropriate and that this value should be applied to the entire sixty-seven-and-a-half acres, including the seventeen acres containing the closed landfill. The court gave particular weight in its valuation to a comparable sale of another property, on Crown Point Road, which also contained a sizeable closed landfill.[2] The court rejected the contention of Essex's expert that the value of the property was enhanced by the presence of the four buildings.

---

2 We note that Paulsboro's expert determined that this site had a $18,450 per-acre value and Essex's expert assigned it a $22,780 per-acre value.

## II.

On appeal, Paulsboro's arguments are not directed at the details of the trial court's determination of the fair market value of the subject property, such as the comparable sales used in making that determination or the court's adjustments of those sales. Rather, the focus of the appeal is Paulsboro's argument that the trial court failed to follow the principles set forth in *Suydam* by valuing the property as if the landfill had been removed, but denying its motion to escrow the condemnation award to establish a fund to pay the costs of that removal. The introduction to Paulsboro's argument summarizes its position:

> The focus of this appeal is simply stated: Does the case law under *Suydam* and its progeny require property containing a "closed" landfill to be appraised as if the landfill would be removed while denying the condemning authority to use condemnation proceeds to remove the landfill?
>
> In short, if the property must be assessed "as remediated" then it should be remediated; if the "closed" landfill cannot be removed, then the property should be valued "as contaminated."

We conclude that the method of valuation of contaminated property set forth in *Suydam* does not apply to a case such as this in which any contamination caused by the landfill formerly located on Essex's property has already been remediated with the DEP's approval. We also conclude that the trial court properly applied ordinary principles of valuation of real property subject to eminent domain in determining its fair market value.

In *Suydam*, the property obtained by eminent domain contained environmental contamination that subjected the condemnee to liability under the Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.50, and perhaps other environmental legislation. 177 *N.J.* at 8, 17–19, 826 *A.*2d 673. The issue presented by the appeal was whether, under those circumstances, "environmental contamination is an appropriate consideration in determining the fair market value of property" in an eminent domain action. *Id.* at 20, 826 *A.*2d 673. The condemnee argued that "devaluing its property for contamination when it is still subject to the costs of a remediation action constitutes an unfair double taking." *Ibid.* The

Court accepted this argument and held that when a condemnee is subject to liability for the cleanup of the property that is the subject of a condemnation action, the property should be valued "as if remediated," the portion of the property's value representing the estimated cost of remediation should be deposited into a trust-escrow account, and the entitlement to the money in that account should be determined in a separate cost recovery action. *Id.* at 22–27, 826 *A*.2d 673. In reaching this conclusion, the Court stated:

> To us, the major issue is the reality of a condemnee's liability under the Spill Act and like statutory initiatives. When property is devalued for contamination in condemnation, landowners first receive discounted compensation in the condemnation proceeding and then are subject to the full cleanup costs, thus suffering what is colloquially denominated as a "double-take." Under that scheme, the condemnor receives a windfall by ultimately obtaining the property in a remediated state at the condemnee's cost, yet paying a discounted price due to the contamination. We think that is fundamentally unfair.
>
> [*Id.* at 23, 826 *A*.2d 673 (citations omitted).]

■ Thus, the prerequisite for use of the special valuation methodology established in *Suydam,* under which the subject property is valued as if remediated and the estimated cost of remediation is deposited into a trust-escrow account, is "the reality of a condemnee's liability [for the costs of remediation] under the Spill Act and like statutory initiatives." *Ibid.* If a site has already been remediated with the DEP's approval and the condemnee is not subject to any additional liability for remediation, the condemnee is no longer exposed to what the Court in *Suydam* referred to as a "double liability," *id.* at 21, 826 *A*.2d 673, and therefore, the special valuation methodology established in that case does not apply.

■ In this case, the gypsum landfill on Essex's property was closed in 1994 with the DEP's approval.[3] Although that former landfill is subject to continued maintenance and monitoring—a

---

[3] This approval was given pursuant to the Sanitary Landfill Facility Closure and Contingency Fund Act. *N.J.S.A.* 13:1E–100 to –176. The DEP appears to consider the closed landfill to be a "sanitary landfill," because it is composed of gypsum, which is an inert, non-hazardous substance. Essex filed a motion to

responsibility BP has now assumed by contract—Essex is not subject to any additional obligation for remediation of the site. The remediation has already occurred. Therefore, there is no need to place a portion of the property's value in a trust-escrow account that can be used to pay the cost of future remediation, which is the contingency the *Suydam* valuation methodology was established to address.

In arguing that the entire amount it deposited into court as an estimate of the fair market value of the property should be held in a trust-escrow account, Paulsboro claims that Essex was required to "remediate" the closed landfill by razing it to ground level, which Paulsboro's expert estimated would cost nearly $60 million. Although the removal of the landfill undoubtedly would increase the property's value, the removal is not required under any environmental statute, and it is not what the Court in *Suydam* meant by remediation of environmental contamination. Rather, the forty-foot high closed landfill is essentially the same as a natural mound with similar dimensions, which the Court in *Suydam* characterized as an "immutable condition of land" that may be properly taken into consideration in determining a property's fair market value under ordinary valuation methodologies. 177 *N.J.* at 22, 826 *A.2d* 673. Therefore, the trial court correctly concluded that the special valuation methodology established in *Suydam* was not applicable.

Furthermore, it is clear that both parties' experts and the trial court attributed a lower value to the property because approximately seventeen of its sixty-seven-and-a-half acres is occupied by a closed landfill rather than being flat, easily developable, land, as would be the case if the landfill were removed. Paulsboro's valuation expert, Allen G. Black, expressed the opinion

---

suppress parts of Paulsboro's reply brief that contain citations to internet websites dealing with gypsum, and Paulsboro filed a cross-motion to strike parts of Essex's answering brief. We have granted both motions. However, none of the citations or arguments to which those motions were addressed are relevant to our disposition of this appeal.

that "[a]s we consider the mound and capped area of the subject property [i.e., the encapsulated seventeen-acre landfill], we recognize that for all intents and purposes this portion of the property lacks meaningful utility." Similarly, Essex's valuation expert, Michael P. Hedden, testified that "when a purchaser would buy the subject property, they would see it for what it is, ... a—67–acre tract ... with a 17–acre leased landfill that has solar panels on it and that given the context in which the property was being bought ..., I don't think that that would negatively impact a buyer's using the site and maximizing the development potential on the remaining acres and accepting the property for what it is." Most significantly, the trial court indicated that its valuation took into account the presence of the closed landfill on seventeen of the sixty-seven-and-a-half acres:

> I recognize that because of the encapsulated landfill there is a rather severe slope to the property. It's actually like a little hill that slopes up at a rather steep incline....
>
> ... [I]n reviewing both of the appraisals and in considering the methodology employed by the appraisers in making adjustments to comparable sales based on the various factors, ... it is appropriate to look at each of the comparables and to adjust for the factors to account for the existence of the landfill.

Moreover, the comparable sale to which the court assigned the greatest weight in valuing the property was a sale of another property, referred to as the Crown Point Road comparable, which also contained a sizeable closed landfill. Thus, the essential premise of Paulsboro's argument—that the experts and trial court valued the property as if the landfill had been removed—is contradicted by the trial record.

Finally, Paulsboro argues that the trial court erred in failing to reduce its valuation of the property because the landfill area was encumbered by a long-term lease to BP. However, the trial court correctly concluded that the lease should be disregarded in valuing the property because it includes a "condemnation clause," under which the lease automatically terminated upon acquisition of the property by eminent domain.[4] *See Town of Kearny v. Discount*

---

[4] Paulsboro does not dispute that the condemnation clause was triggered by its filing of a declaration of taking. In fact, Paulsboro has entered into its own lease with BP under the same terms as the Essex lease.

*City of Old Bridge, Inc.,* 205 *N.J.* 386, 412–13, 16 *A.*3d 300 (2011). Even if a long-term lease would have been a proper consideration in valuing the property in the absence of such a condemnation clause, this clause negates any possible impact the lease could have had upon a determination of the property's fair market value.

Affirmed.