803 A.2d 114 (2002)
353 N.J. Super. 364
NEW JERSEY TRANSIT CORPORATION, a body corporate and politic, Plaintiff-Appellant,
v.
CAT IN THE HAT, LLC, Defendant-Respondent,
and
The State of New Jersey and the City of Trenton, Defendants.
New Jersey Transit Corporation, a body corporate and politic, Plaintiff-Appellant,
v.
The Goldman, Popkin, Caputi, Hegedus and Carom Partnership, a New Jersey General Partnership, T/A Best-Spot Parking, Goldmann, Popkin, Caputi, Hegedus and Carom, a New Jersey General Partnership, T/A Best-Spot Parking, Goldmann, Popkin, Hegedus and Carom, a New Jersey General Partnership, T/A Best Spot Parking, Best Spot Parking Lot, a New Jersey Partnership, T/A Best Spot Parking Lot, Ruth Carom a/k/a Ruth H. Carom, Partner, Barbara Caputi, Partner, Beatrice Goldman a/k/a Beatrice Goldmann, Partner, Carmela Hegedus a/k/a Carmella Hegedus, Partner, and Ruth Popkin a/k/a Ruth C. Popkin, Partner, Defendants-Respondents,
and
City of Trenton, Defendant.
State of New Jersey, by the Commissioner of Transportation, Plaintiff-Respondent,
v.
Sandra E. Eisen, Defendant-Appellant,
and
Adams Perfect Funeral Home, Inc., a Corporation of New Jersey, and City of Jersey City, in the County of Hudson, a Municipal Corporation of New Jersey, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued February 6, 2002.
Decided July 22, 2002.
*116 Maureen Hinchliffe Bonney, Deputy Attorney General, argued the cause for appellant New Jersey Transit Corp. in A-974-00 and A-1656-00 and respondent State of New Jersey, by Commissioner of Transportation in A-5496-00 (David Samson, Attorney General, attorney; Patrick DeAlmeida, Deputy Attorney General, of counsel; Ms. Bonney and Dale Laster Lessne, Deputy Attorney General, on the brief).
Edward D. McKirdy, Morristown, argued the cause for respondents Cat in the Hat, LLC in A-974-00; The Goldman, Popkin, Caputi, Hegedus and Carom Partnership, etc. in A-1656-00 and appellant Sandra E. Eisen in A-5496-00 (McKirdy and Riskin, attorneys; Mr. McKirdy, on the brief).
Before Judges KING, CUFF and WINKELSTEIN.
*115 The opinion of the court was delivered by CUFF, J.A.D.
In these consolidated condemnation appeals, we review the use by the State of environmental reservation clauses, which preserve the State's right to recover from the former property owner the cost of cleanup and removal of hazardous substances on property acquired by the State through its eminent domain authority. Although the issue has been addressed by several trial judges in several vicinages with disparate results, the issue is one of first impression for this court. We hold that the use of the environmental reservation clauses in the final judgment is consistent with and furthers the immunity from cleanup and removal costs conferred on the State and other public entities by N.J.S.A. 58:10-23.11g-d(4).

I
On April 7 and April 12, 2000, plaintiff New Jersey Transit (NJT) commenced two condemnation actions against defendant Goldman, Popkin, Caputi, Hegedus and Carom Partnership (Goldman Popkin), which traded as Best Spot Parking, and against Cat in the Hat, LLC (Cat in the Hat), which traded as Penn Central Parking, by filing verified complaints and declarations of taking. The properties are adjacent but separately owned parking lots proximate to the Trenton Train Station. NJT has acquired each property in preparation for construction of a Light Rail Line between Trenton and Camden.
Defendant Sandra Eisen is the owner of property in Hudson County acquired by the New Jersey Department of Transportation (NJDOT). We have no knowledge of the project for which Eisen's property was acquired because her brief was suppressed and she notified the court she would rely on the legal arguments submitted on behalf of defendants Goldman Popkin and Cat in the Hat.
Preliminary environmental assessments of the two properties alerted NJT of the need for actual soil and groundwater testing. NJT, in a letter dated January 31, *117 2000, informed Goldman Popkin that the Property Acquisition Environmental Cost Estimating (PAECE) Report dated November 4, 1998, detected soil contamination on the property. NJT, however, also wrote that the New Jersey Department of Environmental Protection (NJDEP) would most likely only require placement of a Deed Notice on the parcel, instead of soil remediation, because the samples showed contaminate concentrations below Non Residential NJDEP Soil Cleanup Criteria. A similar letter was sent to Cat in the Hat on March 6, 2000. Each property owner was given the results of the environmental testing and the recommended remediation.
In both PAECE Reports, the environmental consultant stated that the easiest and least expensive way to remediate each site would be to maintain an impervious asphalt cap, i.e. the parking lot surface, to preclude human environmental exposure. The estimated cost of remediation by imposition of the Deed Notice was $5000, with an additional cost of $20,000 for testing and delineation on each site, for a total of $25,000 to be paid by each property owner.
Both verified complaints filed by NJT sought a final judgment which contained clauses by which it, as condemnor, reserved the right to recover any present or future costs of remediation, sanitary landfill closure, and/or removal of solid waste. The clauses read as follows:
7. Plaintiff hereby reserves any and all rights it had or may have to recovery in this action, in any subsequent or pending action or by any administrative means, all costs of remediation and/or cleanup of contamination and/or removal of solid waste and/or sanitary landfill closure that have been incurred or may be incurred in the future by reason of conditions which were in existence as of or prior to the date of vesting of title and possession pursuant to N.J.S.A. 20:3-19. Plaintiff further reserves the right to seek, at its sole discretion, any and all available legal, administrative and equitable remedies to compel defendants to remediate and/or clean up the property in accordance with applicable state and federal statutory and regulatory provisions or to remove solid waste or carry out closure of a sanitary landfill if located on the subject property. Pursuant to N.J.S.A. 58:10-23.11g(d)(4), plaintiff is not liable for cleanup and removal costs of any discharge which occurred or began prior to the New Jersey Transit Corporation's ownership.
8. ....Notwithstanding the results of the State's inspection and the State's determination to limit its cost recovery to the costs associated with the Deed Notice, plaintiff does not accept liability for any pre-existing contamination or solid waste, whether known now or subsequently discovered, on the subject property.... Furthermore, plaintiff has valued the property as if it has been remediated....
Plaintiff further reserves its right to amend, at its discretion, the amount of the estimated cleanup or remediation costs, as well as the scope and breadth of the cleanup or remediation, if additional information becomes available.
On April 13, 2000, the Superior Court, Law Division (Mercer County) signed orders requiring Goldman Popkin and Cat in the Hat to show cause on June 2, 2000, why judgment should not be rendered appointing three disinterested commissioners to fix the value of defendants' properties, and why final judgment should not be entered declaring that NJT properly exercised its powers of eminent domain. Further, the orders to show cause sought judgment declaring the environmental reservations in paragraphs 7 and 8 of the *118 complaints were preserved in accord with the proposed form of orders for judgment and appointing commissioners.
On April 25, 2000, the trial court signed orders for payment into court which permitted NJT to deposit $500,000 for the Goldman Popkin property and $985,000 for the Cat in the Hat property. On May 30, 2000, defendants filed answers and objected to paragraphs 7 and 8 in NJT's complaints. They asserted the clause barred them from asserting the defenses of res judicata, collateral estoppel and the entire controversy doctrine.
Cat in the Hat filed a motion on May 31, 2000, to withdraw the monies deposited by NJT. On June 6, 2000, Goldman Popkin filed an identical motion. NJT filed a request on June 26, 2000, to offset $25,000 for each property to cover the costs of environmental testing and remediation, along with its continued assertion of its right to include the environmental reservation clauses.
Following oral argument, the motion judge issued a written opinion on July 25, 2000. She found:
The court understands and appreciates NJT's concern to preserve its rights in the future. In fact, NJT's effort to include language to protect future claims represents a prudent and reasonable decision. However, the standard environmental reservation "that the defendants are forever barred from the defenses of res judicata, collateral estoppel or the entire controversy doctrine" goes too far. That is a determinationif it is ever made at allwhich will have to be made by some other court at some other time based upon the facts as they may appear at that time based upon a recordnot on the record that now exists.
Noting that "[t]he standard environmental reservation clause ... is fundamentally unfair to the defendants," the court modified the reservation clause so as to "preserve the rights of all of the parties." As such, the motion judge ordered NJT to insert the following in the proposed orders for judgment and appointment of commissioners:
The court notes the reservation of rights claimed by plaintiff in paragraphs 7 and 8 to the complaint relating to contamination, hazardous materials or solid waste existing as of the filing of the complaint. The court has made no rulings regarding the merits or efficacy of those reservations, however. The court also notes the defendants' allegations and defenses asserted in the answer against plaintiff in regard to said reservations. The court has made no ruling regarding the merits of those allegations and defenses.
In the Eisen matter, we have no information of the procedural course of the matter. We know, however, that NJDOT sought to include identical environmental reservation clauses. In his April 27, 2001 oral opinion, Judge D'Italia held the clauses were appropriate. He stated:
I am persuaded by the deputy attorney general's argument that absent such a clause, the availability of the defense would require the State as a prophylactic measure to engage in far more extensive, intrusive, and costly preinspection activities in order to minimize the risks of being precluded from filing the claim in the future.
I'm not convinced that sound policy under both the Condemnation Act, and the Spill Act would require the placing of that burden on the State. As a consequence, I'm satisfied that it is appropriate for the condemning authority to include these reservations of rights in all cases as a prophylactic matter.
*119 Defendants argue that they should be allowed to raise the preclusionary defenses of res judicata, collateral estoppel and the entire controversy doctrine in any subsequent proceeding to recover cleanup and removal costs. This argument requires an understanding of defendants' liability for hazardous substances discovered on their property, as well as the law governing the determination of just compensation in a condemnation action.

II
The Spill Compensation and Control Act (the Spill Act), N.J.S.A. 58:10-23.11 to -23.50, was initially enacted in 1976 and has been amended repeatedly over the years. When initially enacted, the Legislature declared its intention and purpose as follows:
The Legislature intends by the passage of this act to exercise the powers of this State to control the transfer and storage of hazardous substances and to provide liability for damage sustained within this State as a result of any discharge of said substances, by requiring the prompt containment and removal of such pollution and substances, and to provide a fund for swift and adequate compensation to resort businesses and other persons damaged by such discharges,....
[N.J.S.A. 58:10-23.11a.]
The initial focus of the Spill Act was on off shore spills or discharges which spoiled coastline resources. In 1984, however, the requirement that a discharge must threaten the waters of the State was deleted from the Spill Act. L. 1984, c. 142, § 1. Since 1984, a discharge directly onto land without threatening the waters of the State is actionable if it threatens our natural resources. See Summit Assocs. v. Liberty Mutual Fire Ins. Co., 229 N.J.Super. 56, 65, 550 A.2d 1235 (App.Div.1988). See also Bahrle v. Exxon Corp., 279 N.J.Super. 5, 652 A.2d 178 (App.Div.1995) (action commenced under Spill Act for damages for contamination caused by leaking underground storage tanks at a gas station), aff'd, 145 N.J. 144, 678 A.2d 225 (1996).
Initially, the Spill Act also sought to fund cleanup of coastal spills from a fund supported by a tax on major oil and chemical companies. See Exxon Corp. v. Hunt, 109 N.J. 110, 534 A.2d 1 (1987). By 1991, however, the Legislature had amended the Spill Act to also provide a cause of action to private plaintiffs to recover cleanup costs. L. 1991, c. 372, codified as N.J.S.A. 58:10-23.11f. See Bahrle, supra, 279 N.J.Super. at 36, 652 A.2d 178; Mayor and Council of Rockaway v. Klockner & Klockner, 811 F.Supp. 1039, 1051 (D.N.J.1993). See also Pitney Bowes, Inc. v. Baker Indus., Inc., 277 N.J.Super. 484, 487-89, 649 A.2d 1325 (App.Div.1994).
The Spill Act imposes strict liability on any person who has discharged a hazardous substance. It provides that any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, is "strictly liable, jointly and severally, without regard to fault," for all cleanup and removal costs. N.J.S.A. 58:10-23.11g-c(1). Defendants shall be strictly liable for all cleanup and removal costs under the Spill Act as a "discharger" if they, "discharged a hazardous substance, or [are] in any way responsible for any hazardous substance." N.J.S.A. 58:10-23.11g-c(1). The Spill Act defines a "discharge" to mean, "any intentional or unintentional action or omission resulting in the releasing, spilling, leaking, pumping, pouring, emitting, emptying or dumping of hazardous substances into the waters or onto the lands of the State." N.J.S.A. 58:10-23.11b. This court has held, however, that "discharge" does not include passive migration of a hazardous material that previously entered the site. White Oak Funding, Inc. v. Winning, 341 *120 N.J.Super. 294, 299, 775 A.2d 222 (App. Div.), certif. denied, 170 N.J. 209, 785 A.2d 437 (2001).
The Spill Act allows some defenses but limits the defenses available to an owner or operator to those provided by statute. N.J.S.A. 58:10-23.11g-d. Those defenses include an act or omission which leads to a discharge caused "solely by war, sabotage, or God, or a combination thereof." N.J.S.A. 58:10-23.11g-d(1). A person who acquired the property on or after September 14, 1993, on which there has been a discharge is not liable for cleanup and removal costs if the owner can demonstrate that the property was acquired after the discharge, that when the owner acquired the property it did not know and had no reason to know that a discharge had occurred, that the owner did not discharge the hazardous substance and is not responsible in any way for the substance and is not a corporate successor to the discharger, and the owner gave notice of the discharge to NJDEP upon actual discovery of the discharge. N.J.S.A. 58:10-23.11g-d(1) and (2).
While severely limiting the defenses a property owner may assert, the Spill Act also confers immunity on a public entity which acquires the property by any means, including condemnation. A 1993 amendment to the Spill Act, L. 1993, c. 139, § 44, added a provision that a government entity, which acquires contaminated property by virtue of its function as a sovereign, is not liable for a discharge that occurred or commenced prior to the period of ownership. No immunity is bestowed for any discharge which was caused by or contributed to by the public entity. N.J.S.A. 58:10-23.11g-d(4). See Assembly Policy and Rules Committee, Statement to Senate Bill No. 1070.
In 1997, the Spill Act was amended once again to address former industrial sites which remain vacant or underutilized in part due to contamination by the discharge of hazardous substances. L. 1997, c. 278, § 27 (codified at N.J.S.A. 58:10-23.11a). These amendments are known as the Brownfields and Contaminated Site Remediation Act (the Brownfields Act), L. 1997, c. 278. The intent of the Brownfields Act was to loosen the strict standards of the 1993 legislation for investors in possibly contaminated property while maintaining strict discharge liability. The committee statement accompanying this amendment states:
This bill was crafted with three predominant policy goals. First, the bill is intended to result in more remediations being performed and brownfields being redeveloped. Second, the bill will not lessen any environmental or health standard. The strict standards set in the 1993 legislation and enforced by the Department of Environmental Protection (DEP) will remain in place.Finally, the person responsible for the discharge will not be given any relief from liability. Only those "innocent" parties who either unknowingly buy contaminated property or who clean up a contaminated property that they have purchased will be given any liability protections.
[Senate Budget and Appropriations Committee, Statement to Senate Bill No. 39 (emphasis added).]
The Brownfields Act included an amendment to the immunity provision, N.J.S.A. 58:10-23.11g-d(4). This amendment broadened the immunity conferred on public entities which acquire real property to include property acquired for redevelopment purposes. The committee statement which accompanied the legislation observed:
Public entity liabilityAlthough the law generally provides that public entities *121 are not liable for existing contamination on land they acquire through actions such as a tax lien or foreclosure, a public entity may be liable for knowingly and voluntarily acquiring contaminated property, even if for a public purpose such as redevelopment. The committee substitute amends the law to limit public entity liability for contaminated property they acquire by any means.
[Senate Environment Committee, Statement to Senate Committee Substitute for Senate No. 39, Assembly, No. 2250 ACS, Senate, Nos. 1815 and 1539.]
Following the 1997 amendment, the complete text of N.J.S.A. 58:10-23.11gd(4) provides:
(4) Any federal, State, or local governmental entity which acquires ownership of real property through bankruptcy, tax delinquency, abandonment, escheat, eminent domain, condemnation or any circumstance in which the governmental entity involuntarily acquires title by virtue of its function as sovereign, or where the governmental entity acquires the property by any means for the purpose of promoting the redevelopment of that property, shall not be liable, pursuant to subsection c. of this section or pursuant to common law, to the State or to any other person for any discharge which occurred or began prior to that ownership. This paragraph shall not provide any liability protection to any federal, State or local governmental entity which has caused or contributed to the discharge of a hazardous substance. This paragraph shall not provide any liability protection to any federal, State, or local government entity that acquires ownership of real property by condemnation or eminent domain where the real property is being remediated in a timely manner at the time of the condemnation or eminent domain action.
By its terms, public entities which acquire property, voluntarily or involuntarily, are immune from the cost of cleanup and remediation of hazardous substances, except in the limited circumstances in which the public entity caused the contamination.

III
We now turn to a consideration of the award of compensation to property owners on the acquisition of their property by a public entity through its eminent domain authority. The federal and state constitutions guarantee that private property will not be taken for public use without just compensation. U.S. Const., amend. V; N.J. Const., art. I, ¶ 20.
The concept of "just compensation" requires the property owner to be placed in as good a position had the property not been taken. Therefore, the property owner is entitled to that amount of money that will make it whole. City of Orange Tp. v. Empire Mortgage Servs., Inc., 341 N.J.Super. 216, 221-22, 775 A.2d 174 (App.Div.2001); see, e.g., Bowers v. Town of Bloomfield, 81 N.J.Eq., 163, 165, 86 A. 428 (E. & A.1913). Just compensation is determined by equitable principles, and its measure varies with the facts. There is no single element which is controlling. Therefore, it is proper to consider all factors indicative of the value of the property and which would have been present in the minds of a willing buyer and a willing seller. 26 Am.Jur.2d. Eminent Domain § 295 (1996).
In assigning fair market value for property taken through condemnation, the inquiry is not limited to the actual use of the property on the date of taking but is, rather, based on its highest and best use. See, e.g., Ford Motor Co. v. Township of Edison, 127 N.J. 290, 301, 604 A.2d 580 (1992); State by Comm'r of *122 Transp. v. Hope Rd. Assocs., 266 N.J.Super. 633, 641, 630 A.2d 387 (App.Div.1993), modified on other grounds, 136 N.J. 27, 641 A.2d 1038 (1994). And "highest and best use" in turn is broadly defined as "`the use that at the time of the appraisal is the most profitable, likely use'" or alternatively, "`the available use and program of future utilization that produces the highest present land value'" provided that "use has as a prerequisite a probability of achievement." County of Monmouth v. Hilton, 334 N.J.Super. 582, 587, 760 A.2d 786 (App.Div.) (quoting Ford Motor Co., supra, 127 N.J. at 300-01, 604 A.2d 580 (quoting Inmar Assocs., Inc. v. Township of Edison, 2 N.J. Tax 59, 64-65 (Tax 1980))), certif. denied, 167 N.J. 633, 772 A.2d 935 (2000).
The fair market value is determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act. Village of S. Orange v. Alden Corp., 71 N.J. 362, 368, 365 A.2d 469 (1976). "In making a determination as to value, then, all the considerations which would influence a willing buyer and a willing seller in coming to terms as to price should be laid before the trier of fact." Id. at 368, 365 A.2d 469. Further, any evidence which is reasonably probative of fair market value is admissible in a condemnation action. State by Comm'r of Transp. v. F & J Partnership, 250 N.J.Super. 19, 26, 593 A.2d 352 (App. Div.1991).

IV
As our review of the Spill Act demonstrates, the Legislature has not only imposed liability for cleanup and removal costs on property owners who have discharged hazardous substances which have contaminated soil or water but also strictly limited the defenses which a property owner may assert in defense of a claim for cleanup and removal costs. N.J.S.A. 58:10-23.11g-d(1)(4). Furthermore, just compensation for property acquired by a public entity is determined by reference to the highest and best use of the property. The State's practice of appraising the property as if any contamination has been remediated is consistent with this rule. Nevertheless, defendants argue that they should be able to raise the preclusionary defenses of res judicata, collateral estoppel, and the entire controversy doctrine. They contend that their inability to raise these defenses leaves them exposed to claims for an indeterminate period into the future, that NJT and NJDOT have had ample opportunity to investigate the site, and by implication that they may have to pay twice for the existence of contaminants on this site.
The latter concern, however, is predicated on the assumption that the existence of contamination is reflected in the just compensation paid to the property owner. Interestingly, no court in this State has ruled that the existence of contamination or hazardous substances on the site is a relevant factor for consideration by a jury in setting just compensation.[1] The State also asserts that its valuation of the property assumes the property has been remediated. It will, however, withhold the estimated cost of removal and cleanup from the property owner.
*123 Defendants' position threatens not only the immunity conferred by the Legislature on acquiring public entities but also runs counter to the legislative intent to impose strict liability on those who are responsible for soil and water contamination. In the end, defendants' arguments are no more than a thinly veiled attempt to enhance their position over other owners of contaminated property solely due to the fact that their property was taken by a public entity for a public purpose. In effect, they seek to have the final condemnation judgment act as a bar to an after-discovered contamination claim. We discern no intent by the Legislature to immunize a property owner from the costs of cleanup and removal of hazardous substances on their property solely due to the fact that a public entity has acquired their property for a public purpose. In fact, such a result flies in the face of a statutory scheme which imposes liability on a public entity for cleanup and removal costs only to situations in which the public entity is responsible for the contamination.
Thus, we conclude that the environmental reservation clauses, paragraphs 7 and 8 of the proposed final judgment, are consistent not only with the immunity conferred on NJT and NJDOT but also with the liability imposed on property owners for the cleanup and removal costs of hazardous substances found on their property. Therefore, we affirm the May 2, 2001 order of Judge D'Italia that any after-discovered claims relating to contamination from hazardous materials and solid waste existing prior to or as of the date of vesting of title and possession may be raised without being barred by the principles of res judicata, collateral estoppel and the entire controversy doctrine. We reverse the September 6, 2000 orders in the Goldman Popkin and Cat in the Hat appeals which defer the resolution of the ability of the defendants to assert preclusionary defenses to any subsequent cost recovery action.
Affirmed in part; reversed in part.
NOTES
[1] We note, however, that this issue will be presented to this court in the 2002-03 term in an appeal entitled The Housing Authority of the City of New Brunswick v. Suydam Investors, L.L.C., A-5439-00T5. Nationwide, there is a split of authority as to the admissibility of evidence of environmental contamination and remediation costs, but a majority of the jurisdictions which have considered the issue have concluded that such evidence is admissible. See Northeast Ct. Econ. Alliance, Inc. v. ATC Partnership, 256 Conn. 813, 776 A.2d 1068, 1079 (2001), and cases collected and discussed therein.