826 A.2d 690

NEW JERSEY TRANSIT CORPORATION, A BODY CORPORATE AND POLITIC, PLAINTIFF–RESPONDENT, v. CAT IN THE HAT, LLC, DEFENDANT–APPELLANT, AND THE STATE OF NEW JERSEY, AND THE CITY OF TRENTON, DEFENDANTS.

_____

NEW JERSEY TRANSIT CORPORATION, A BODY CORPORATE AND POLITIC, PLAINTIFF–RESPONDENT, v. THE GOLDMAN, POPKIN, CAPUTI, HEGEDUS AND CAROM PARTNERSHIP, A NEW JERSEY GENERAL PARTNERSHIP, T/A BEST–SPOT PARKING, GOLDMANN, POPKIN, CAPUTI, HEGEDUS AND CAROM, A NEW JERSEY GENERAL PARTNERSHIP, T/A BEST SPOT PARKING, GOLDMANN, POPKIN, HEGEDUS AND CA-ROM, A NEW JERSEY GENERAL PARTNERSHIP, T/A BEST–SPOT PARKING, BEST–SPOT PARKING LOT, A NEW JERSEY PARTNERSHIP, T/A BEST SPOT PARKING LOT, RUTH CA-ROM, A/K/A RUTH H. CAROM, PARTNER, BARBARA CAPUTI, PARTNER, BEATRICE GOLDMAN, A/K/A BEATRICE GOLD-MANN, PARTNER, CARMELA HEGEDUS, A/K/A CARMELLA HEGEDUS, PARTNER, AND RUTH POPKIN, A/K/A RUTH C. POPKIN, PARTNER, DEFENDANTS–APPELLANTS, AND CITY OF TRENTON, DEFENDANT.

_____

STATE OF NEW JERSEY, BY THE COMMISSIONER OF TRANS-PORTATION, PLAINTIFF–RESPONDENT, v. SANDRA E. EI-SEN, DEFENDANT–APPELLANT, AND ADAMS PERFECT FU-NERAL HOME, INC., A CORPORATION OF NEW JERSEY, AND CITY OF JERSEY CITY, IN THE COUNTY OF HUDSON, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT.

Argued April 29, 2003—Decided July 10, 2003.

30

*Edward D. McKirdy* argued the cause for appellants (*McKirdy and Riskin*, attorneys; *Mr. McKirdy* and *L. Jeffrey Lewis*, on the briefs).

*Maureen Hinchliffe Bonney*, Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey*, Acting Attorney General of New Jersey, attorney; *Patrick DeAlmeida*, Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

LONG, J.

In these consolidated condemnation cases, we are called on to determine whether a trial court may enter an order in an eminent domain proceeding that preserves a governmental condemnor's ability to bring a separate cost-recovery action against a condemnee for cleanup of contamination and if so, whether that order also may bar the condemnee from later raising the preclusionary defenses of *res judicata*, collateral estoppel and the entire controversy doctrine. In light of our decision today in *Housing Auth. of City of New Brunswick v. Suydam Invs.*, 177 *N.J.* 2, 826 *A.*2d 673,

2003 *WL* 21543547 (2003), holding that contamination should not be considered as a valuation issue in a condemnation case, but should be reserved for a separate cost-recovery action, it follows that the reservation of rights clause is legitimate and that *res judicata,* collateral estoppel and entire controversy defenses are unavailable in the later cost-recovery action.

I

A.

*Goldman* and *Cat in the Hat*

In April 2000, plaintiff New Jersey Transit Corporation (NJT) began condemnation actions against defendant Goldman, Popkin, Caputi, Hegedus and Carom Partnership (Goldman), t/a Best Spot Parking and defendant Cat in the Hat, LLC (Cat in the Hat), T/A Penn Central Parking (collectively condemnees). The subject properties, separately owned, are adjacent commercial parking lots near the Trenton Train Station. The Goldman properties consist of approximately 8,800 square feet, and the Cat in the Hat properties consist of approximately 16,000 square feet. NJT sought to acquire the sites in connection with the construction of its Southern New Jersey Light Rail Transit System between Trenton and Camden. The construction plans for the subject properties call for NJT to construct a station stop terminus, which includes construction platforms, covering canopy, associated lighting, automated ticket vending and various artistic treatments. The structure will stretch across the two properties and the remainder of both properties will be available for other uses, including parking. At the time of NJT's condemnation actions, both properties operated as commercial automobile parking lots covered by impervious asphalt caps.

Prior to the institution of its condemnation proceedings, NJT retained an environmental testing firm to conduct what is known as a Phase I assessment of the subject properties. The Phase I assessment included an investigation of the history, prior uses and

other available information on the site, an examination of relevant environmental records, and a limited site inspection. *N.J.A.C.* 7:26E–3.1; Robert I. McMurray, *Treatment of Environmental Contamination in Eminent Domain Cases,* C975 *ALI–ABA* 237 (1995).

According to Nicholas Marton, Manager of Environmental Compliance for NJT's Office of New Rail Construction, the history of the subject sites, including prior hotel usage and demolition and current parking lot usage, triggered the need for an actual site investigation. "The purpose of a site investigation is to determine if any contaminants are present at the site, or, have emanated or are emanating from the site above any of the applicable unrestricted use remediation standards or if no further remediation is required." *N.J.A.C.* 7:26E–3.3. Soil and groundwater testing were conducted prior to condemnation negotiations to identify potential environmental contamination.

After the site investigation, a Property Acquisition Environmental Cost Estimating (PAECE) report was prepared. Each condemnee received a report that calculated the estimated cost that the property owner likely would incur to remediate the property, to develop it to its highest and best use, and to comply with New Jersey Department of Environmental Protection (NJDEP) requirements.

In January and March of 2000, NJT informed the condemnees that the PAECE report detected soil contamination on the properties but NJT indicated that "[b]ecause the samplings showed contaminant concentrations below Non–Residential NJDEP Soil Cleanup Criteria, NJDEP would most likely not require further investigation and cleanup or remediation in accordance with NJDEP guidelines and regulations." Instead of soil remediation, NJT stated that NJDEP likely would require placement of a Declaration of Environmental Restriction, commonly known as a Deed Notice, to provide notice to any subsequent owners of the contamination on the property. Moreover, NJT's environmental consultant indicated that the easiest and least expensive method to

remediate the site would be to maintain the "impervious asphalt cap, *i.e.,* the parking lot surface, to preclude human exposure to any contaminants."

NJT estimated the cost of remediation for each property at $25,000, which included NJT's cost of investigating, testing and delineation ($20,000) and the cost of preparing and filing a deed notice ($5,000). According to NJT, those costs "represented the minimum cost that any owner would incur to remediate the property in compliance with state environmental standards." The actual testing and delineation costs were $23,000, plus $5,000 for the deed notice for the Goldman properties and $27,000, plus $5,000 for the deed notice for the Cat in the Hat properties.

NJT filed verified complaints and declarations of taking to acquire the subject properties by eminent domain. Each complaint sought a final judgment with an "environmental reservation clause" pursuant to which NJT, as a governmental entity condemnor, reserved its right to recover any present or future costs of remediation, sanitary landfill closure, and/or removal of solid waste. The reservation clause provided in relevant part:

7. Plaintiff hereby reserves any and all rights it had or may have to recover in this action, in any subsequent or pending action or by any administrative means, all costs of remediation and/or cleanup of contamination and/or removal of solid waste and/or sanitary landfill closure that have been incurred or may be incurred in the future by reason of conditions which were in existence as of or prior to the date of vesting of title and possession pursuant to *N.J.S.A.* 20:3–19. Plaintiff further reserves the right to seek, at its sole discretion, any and all available legal, administrative and equitable remedies to compel defendants to remediate and/or cleanup the property in accordance with applicable state and federal statutory and regulatory provisions or to remove solid waste or carry out closure of a sanitary landfill if located on the subject property. Pursuant to *N.J.S.A.* 58:10–23.11g(d)(4), plaintiff is not liable for the cleanup and removal costs of any discharge which occurred or began prior to the New Jersey Transit Corporation's ownership.
8. Plaintiff has caused the subject property to be inspected for the existence of contamination and/or solid waste and has found contamination and/or solid waste which requires further investigation and cleanup or remediation in accordance with New Jersey Department of Environmental Protection guidelines and regulations. Since the New Jersey Department of Environmental Protection would likely permit the property owners to address the (soil) contamination on the parcel through the placement of a Deed Notice on the parcel, plaintiff has determined to seek recovery of the costs associated with execution and establishment of a Deed Notice on the

parcel. It is estimated that the anticipated costs will be approximately $25,000.00. Notification to the owners regarding the contamination and anticipated remediation is set forth in "Exhibit C" attached hereto. However, the property will be appraised taking into consideration the market effect of a Deed Notice on the property.

Notwithstanding the results of the State's inspection and the State's determination to limit its cost-recovery to the costs associated with the Deed Notice, plaintiff does not accept liability for any pre-existing contamination or solid waste, whether known now or subsequently discovered, on the subject property.... Furthermore, plaintiff has valued the property as if it has been remediated.... Plaintiff further reserves its right to amend, at its discretion, the amount of the estimated cleanup or remediation costs, as well as the scope and breadth of the cleanup or remediation, if additional information becomes available.

Further, NJT's proposed orders for judgment and appointment of commissioners included the following language:

5. In accordance with the reservations made by plaintiff in paragraphs 7 and 8 of the Verified Complaint relating to issues of contamination, hazardous material or solid waste existing as of or prior to the date of vesting of title and possession pursuant to *N.J.S.A.* 20:3–19, plaintiff may raise any such claims, or any other claims relating thereto, without being barred by the principles of *res judicata*, collateral estoppel and/or the Entire Controversy Doctrine. The Court reserves as to the merits of such claims. Defendants shall also retain the right to assert any and all defenses, when and if such claims are raised, except for the defenses of *res judicata*, collateral estoppel and/or the Entire Controversy Doctrine premised upon this condemnation proceeding.

In April 2000, the trial court ordered the condemnees to show cause why judgment should not be entered declaring that NJT properly exercised its powers of eminent domain and appointing three disinterested commissioners to fix the value of the property. Additionally, the orders to show cause sought judgment declaring that the reservations made in paragraphs 7 and 8 of the complaint as to the issues regarding contamination, hazardous material or solid waste, existing as of our prior to the date of vesting of title and possession pursuant to *N.J.S.A.* 20:3–19, were preserved in accord with the proposed form of order for judgment and appointing commissioners.

NJT deposited $500,000 in court for the Goldman properties and $985,000 for the Cat in the Hat properties, which represented the

fair market value thereof as if the property had been remediated [1]. The condemnees filed answers and objected to reservation of rights language in NJT's proposed order for final judgment. The condemnees requested that NJT bring all claims, including those relating to valuation of the subject property, in one action. They also contended that NJT did not conduct proper *bona fide* negotiations because of its "defective environmental reservations" and "illegal environmental claims." Subsequently, the condemnees filed motions to withdraw the monies deposited by NJT. NJT responded with a request to withhold $25,000 from each condemnation award to cover the estimated transactional costs.

The trial court ruled that NJT's environmental reservation provision was valid, but modified the proposed language. The court noted that "NJT, in essence, by including the standard environmental reservation, is seeking indemnification from the defendants, in light of the Spill Act provisions, which exempt a state governmental entity that acquires ownership of property through eminent domain, from liability for the costs of cleanup and removal of any discharge which occurred or began prior to that ownership." The court went on:

> The court understands and appreciates NJT's concern to preserve its rights in the future. In fact, NJT's effort to include language to protect future claims represents a prudent and reasonable decision. However, the standard environmental reservation "that the defendants are forever barred from the defenses of res judicata, collateral estoppel or the entire controversy doctrine" goes too far. That is a determination if it is ever made at all which will have to be made by some other court at some other time based upon the facts as they may appear at that time based upon a record not on the record that now exits.
>
> . . . .
>
> The effect of the modified environmental reservation will not be to automatically preclude NJT from filing suit against the property owner, in the event that contamination is discovered at a latter date. Nor will it have the effect of always and routinely permitting the condemnor to bring suit without any regard whatsoever for the doctrines of finality of judgment, *res judicata* or the entire controversy

---

[1] "As if remediated" is slightly different than "as if clean" insofar as it incorporates a so-called remediation stigma discount. We recognized that notion of a remediation stigma in *Inmar Assocs., Inc. v. Borough of Carlstadt*, 112 *N.J.* 593, 608–09, 549 *A.2d* 38 (1988).

doctrine. It will permit the court, in those cases of after-discovered contamination, to weigh, based upon the facts of each case, whether those doctrines should be invoked or whether the circumstances relating to the after-discovery of the particular environmental contamination in that case render those doctrines inapplicable. The modified language protects the interest of NJT while at the same time vesting the decision regarding *res judicata*, equitable estoppel and the entire controversy doctrine with the judge presiding over the subsequent proceeding. The modification in no way impairs the ability of NJT, or any other governmental entity, from initiating and recovering in a cost-recovery suit the costs related to remediation and clean-up.

Accordingly, the court inserted the following modified language in the orders for final judgment and appointment of commissioners:

The court notes the reservation of rights claimed by plaintiff in paragraphs 7 and 8 to the complaint relating to contamination, hazardous materials or solid waste existing as of the filing of the complaint. The court has made no rulings regarding the merits or efficacy of those reservations, however. The court also notes the defendants' allegations and defenses asserted in the answer against plaintiff in regard to said reservations. The court has made no ruling regarding the merits of those allegations and defenses.

In August 2000, the court entered an order that permitted the condemnees to withdraw the amount of just compensation determined by the appointed commissioners, but required each to maintain on deposit in court the $25,000 in estimated transactional costs pending further order of the court.

## B.

### *Eisen*

The facts surrounding the valuation method in the *Eisen* matter are not of record. What is known is that defendant, Sandra Eisen, was the owner of property in Hudson County acquired by eminent domain by the New Jersey Department of Transportation (NJDOT). *State, by Comm'r of Transp. v. Eisen,* No. L–1238–01 (Law Div.2001). At some point in the case, the reservation of rights issue raised by NJT in *Goldman* and *Cat in the Hat* also was raised by NJDOT in *Eisen*. However, there, the trial court included in the condemnation judgment a reservation of rights provision identical to the provision in NJT's proposed orders,

including the preclusion of *res judicata,* collateral estoppel and the entire controversy defenses. That trial court held:

> [A]bsent such a clause, the availability of the [preclusionary] defense[s] would require the State as a prophylactic measure to engage in far more extensive, intrusive, and costly preinspection activities in order to minimize the risks of being precluded from filing the claim in the future.
>
> I'm not convinced that sound policy under both the Condemnation Act, and the Spill Act would require the placing of that burden on the State. As a consequence, I'm satisfied that it is appropriate for the condemning authority to include these reservations of rights in all cases as a prophylactic matter.

All condemnees appealed [2] and in July 2002, the Appellate Division affirmed in *Eisen* and reversed in *Goldman* and *Cat in the Hat. New Jersey Transit Corp. v. Cat in the Hat,* 353 *N.J.Super.* 364, 378, 803 *A.*2d 114 (2002). In so doing, Judge Cuff, writing for the panel stated:

> As our review of the Spill Act demonstrates, the Legislature has not only imposed liability for cleanup and removal costs on property owners who have discharged hazardous substances which have contaminated soil or water but also strictly limited the defenses which a property owner may assert in defense of a claim for cleanup and removal costs. *N.J.S.A.* 58:10–23.11g–d(1)(4). Furthermore, just compensation for property acquired by a public entity is determined by reference to the highest and best use of the property. The State's practice of appraising the property as if any contamination has been remediated is consistent with this rule. Nevertheless, defendants argue that they should be able to raise the preclusionary defenses of *res judicata,* collateral estoppel, and the entire controversy doctrine. They contend that their inability to raise these defenses leaves them exposed to claims for an indeterminate period into the future, that NJT and NJDOT have had ample opportunity to investigate the site, and by implication that they may have to pay twice for the existence of contaminants on this site.
>
> The latter concern, however, is predicated on the assumption that the existence of contamination is reflected in the just compensation paid to the property owner. Interestingly, no court in this State has ruled that the existence of contamination or hazardous substances on the site is a relevant factor for consideration by a jury in setting just compensation. The State also asserts that its valuation of the property assumes the property has been remediated. It will, however, withhold the estimated cost of removal and cleanup from the property owner.
>
> Defendants' position threatens not only the immunity conferred by the Legislature on acquiring public entities but also runs counter to the legislative intent to

---

[2] Eisen relied on the briefs submitted on behalf of Goldman and Cat in the Hat.

impose strict liability on those who are responsible for soil and water contamination. In the end, defendants' arguments are no more than a thinly veiled attempt to enhance their position over other owners of contaminated property solely due to the fact that their property was taken by a public entity for a public purpose. In effect, they seek to have the final condemnation judgment act as a bar to an after-discovered contamination claim. We discern no intent by the Legislature to immunize a property owner from the costs of cleanup and removal of hazardous substances on their property solely due to the fact that a public entity has acquired their property for a public purpose. In fact, such a result flies in the face of a statutory scheme which imposes liability on a public entity for cleanup and removal costs only to situations in which the public entity is responsible for the contamination.

[*Id.* at 376–78, 803 *A.*2d 114 (footnote omitted).]

All condemnees petitioned for certification. We granted the petitions, 175 *N.J.* 80, 812 *A.*2d 1111 (2002), and now affirm.

## II

The condemnees' primary argument is that contamination should not be considered once to reduce fair market value in an eminent domain proceeding and again as the basis for a cost-recovery action. The condemnees also claim that they should be able to raise the preclusionary defenses of *res judicata*, collateral estoppel and entire controversy based on a complete record at the time of a subsequent environmental action, rather than "on the basis of the incomplete record that exists before any contamination has ever been discovered."

NJT counters that the reservation of rights provision is the only practical way to protect its statutory right to pursue a cost-recovery action for cleanup and removal under the Spill Act; to guarantee that its pre-existing statutory immunity will remain intact; and to compel responsible parties to pay for cleanup. In so arguing, NJT emphasizes that a reservation of rights clause does not preclude a property owner or a former property owner from raising, in a subsequent proceeding, any substantive defenses that may be available under the Spill Act or any equitable defenses, but merely avoids the unjust result of allowing the condemnation action to interdict a subsequent cost-recovery ac-

tion.  However, NJT concedes that a condemnee should not have to pay twice for the same contamination.

The condemnees' rejoinder is that the right to raise preclusionary defenses is neither intended to prevent a cost-recovery action nor to bar a contamination claim that could not have been known at the time of the condemnation.  According to the condemnees, those defenses are necessary to preclude double liability and to allow the interposition of a claim that the State's initial investigation was "unreasonable."

### III

In a companion case decided today, *Housing Auth.*, *supra*, 177 *N.J.* 2, 826 *A.*2d 673, we approved a methodology for valuing contaminated property that effectively removes the contamination issue from the condemnation proceeding and reserves it for the cost-recovery action.  *Id.* at 24, 826 *A.*2d 673.  Under that methodology, the condemnor appraises the property as if remediated, deposits that amount into a trust-escrow account in court and reserves the right to initiate a separate action to recover remediation costs.  *Id.* at 28, 826 *A.*2d 673.  That scheme fully addresses the condemnees' concerns over double liability.  If the value of a condemnee's property is not reduced for contamination, then the condemnee's payment for remediating the property in a subsequent cost-recovery action cannot constitute double liability.

Plainly, the general reservation of rights language is a part of that scheme.  Its very purpose is to avoid an entire controversy claim in the future.  *See R.* 4:30A ("Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of omitted claims to the extent required by the entire controversy doctrine.").  Indeed, in 1992, the Department of Law and Public Safety proposed an amendment to *Rule* 4:30A to except condemnation actions from the application of the entire controversy doctrine because of the increasing prevalence of environmentally contaminated properties that are subject to condemnation.  The

Supreme Court Committee on Civil Practice rejected that proposal, stating that "[n]o exception to the entire controversy doctrine need be carved out for condemnations." 130 *N.J.L.J.* Supplement (Feb. 24, 1992). Instead, the Committee indicated that a governmental condemnor could "avoid the consequences of the doctrine by moving to sever and reserve a particular claim, and this would be an appropriate way to handle contamination issues." *Ibid. See also* Pressler, *Current N.J. Court Rules,* comment 2 on *R.* 4:30A (2003) ("It is ... clear that the court has the right to direct reservation of a claim against an existing or enjoined party for later action, and the entire controversy doctrine does not apply when the court has done so or was likely to have done so.... [I]f a party wishes to reserve a claim for future action it must nevertheless submit the claim to the court in the pending action for a ruling as to joinder or reservation.").

■ In effect, by the reservation of rights language, NJT notifies the trial court that the condemnation suit does not adjudicate the contamination claim and that all such claims are reserved for determination in a separate cost-recovery action. Because the very purpose of the reservation of rights clause is to forestall a future entire controversy claim, the preclusion of that defense simply follows from the existence of the reservation.

The condemnees' claims regarding *res judicata* and collateral estoppel are equally insupportable. They argue that those defenses should be ruled on at the time of the later environmental action. In general that is an apt approach. However, where as here, property is valued in condemnation as if remediated (in other words, without a reduction in the fair market value due to contamination) and the State specifically reserves the right to recover cleanup costs in a separate proceeding, collateral estoppel and *res judicata* are, by their very nature, inapplicable because the condemnation action did not *adjudicate* the environmental issues. What is held in the trust-escrow account is merely an estimate of cleanup costs.

■ The condemnees also advance a subtler argument that is based theoretically on the three precluded defenses. They claim that they should be allowed to interpose the "unreasonableness" of the government's initial environmental assessment of the property as a shield against future liability. The underpinning of that argument is that all contamination issues that *could* have been discovered at the time of condemnation, *should* have been discovered. By way of example, if, after an environmental investigation, a property is valued as if remediated and the transactional costs, including cleanup, are estimated and withheld, and later buried drums or a plume are discovered, the governmental condemnor obviously will seek recompense from the condemnee for all of the contamination. The condemnees argue that they should have the ability to shield themselves from further cleanup liability by challenging the government's initial environmental assessment of the property as "unreasonable" or inadequate. In other words, they should be allowed to claim that the government did not do enough at the time of the condemnation and should therefore be barred from further recovery.

There are several problems with that analysis. The first is practical. Due to the nature of eminent domain, a complete initial environmental investigation prior to condemnation is neither possible nor desirable in many cases because of the extent of the disruption it might entail. In fact, according to NJT, the most invasive environmental testing ordinarily takes place after condemnation when construction of a project begins. That is why the value as if remediated including transactional costs is merely an estimate.

Second, the Eminent Domain Act does not require the condemnor to conduct an environmental assessment of the property. Instead, the Act only requires that "what is known" by the condemnor (which obviously includes what must be known to determine value as if remediated) must be conveyed. *See N.J.S.A.* 20:3–6 (indicating that bona fide negotiations between condemnor

and prospective condemnee shall include offer in writing by condemnor to condemnee setting forth, among other things, compensation offered and reasonable disclosure of manner in which amount of compensation has been calculated); *R.* 4:73–1 (providing that condemnation complaint shall include statement showing amount of compensation offered by condemnor and reasonable disclosure of manner in which amount has been calculated).

Third and most important, the condemnees' suggestion that the reasonableness of the government's initial investigation should be an arrow in their quiver flies in the face of the statutory scheme underlying the Spill Act. The Legislature unequivocally has declared that a governmental condemnor is immune from liability for contamination (except in extremely limited circumstances) and that the party responsible for the contamination remains liable even after transfer of the property. *See N.J.S.A.* 58:10–23.11g–c(1) ("Any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred."). The condemnees' argument that the reasonableness of the government's initial investigation should be interposed as a defense would chip away at the government's immunity and shield the condemnees from liability in contravention of the statutory scheme. That is why it cannot be countenanced.

In sum, we adopt Judge Cuff's thorough and thoughtful analysis of the issue presented. The reservation of rights clause and the preclusion of the defenses of *res judicata,* collateral estoppel and entire controversy are proper concomitants of the valuation methodology we have today adopted in *Housing Auth., supra,* 177 *N.J.* at 35, 826 *A.*2d 694.

## IV

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—6.

*Opposed*—None.